IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KEITH LAMAR COLE                                                    PLAINTIFF


                    v.                    CIVIL NO. 15-5212


CAROLYN W. COLVIN, Commissioner
Social Security Administration                               DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Keith Lamar Cole, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed his current application for DIB on March 24, 2012, alleging an inability to work since February 17, 2012, due to thumb problems, arthritis, osteoarthritis in the back, heart problems and knee problems.  (Doc. 11, pp. 192, 228).  An administrative video hearing was held on October 24, 2013, at which Plaintiff appeared with counsel and testified.  (Doc. 11, pp. 102-133).

By written decision dated April 4, 2014, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe.  (Doc. 11,

1

p. 90). Specifically, the ALJ found Plaintiff had the following severe impairments: aortic stenosis and osteoarthritis. However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Doc. 11, p. 91). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform a full range of light work as defined in 20 C.F.R. § 404.1567(b). (Doc. 11, p. 91). The ALJ, with the use of the Medical-Vocational Guidelines (Grids), found Plaintiff was not disabled. (Doc. 11, p. 97).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which after reviewing additional evidence submitted by Plaintiff, denied that request on July 6, 2015. (Doc. 11, pp. 5-11). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 9, 10).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the time of the administrative video hearing held before the ALJ on October 24, 2013, Plaintiff was forty-eight years of age and had a high school education and completed a computer drafting program. (Doc. 11, pp. 102, 229). Plaintiff testified that he last worked on February 17, 2012, when the business he was working for closed. (Doc. 11, p. 111).

Prior to the alleged onset date of February 17, 2012, Plaintiff was treated for various issues which included an aortic valve disorder; hypertension; osteoarthritis; dental caries; a

hernia repair; and neck, back, and knee pain.  The medical evidence during the relevant time period reflects the following.

On February 23, 2012, Plaintiff was noted to have a tiny spot on his lungs. (Doc. 11, p. 482, 679-681, 822).  Dr. Maria Cristina M. Judit recommended monitoring the spot.  On March 2 2012, Plaintiff was admitted into the hospital after complaining of wheezing, shortness of breath, and coughing. (Doc. 11, pp. 398-482, 678-679, 696-697, 710, 734-822, 888-893, 900, 921-922).   A review of systems indicated Plaintiff denied chest pain, nausea, vomiting, weakness, numbness or headache.  (Doc. 11, p. 475).  Plaintiff was admitted with a clinical impression of pneumonia versus a viral syndrome with fever.  Plaintiff tolerated respiratory treatments well.  Plaintiff's aortic stenosis was noted as stable.  Plaintiff was noted to ambulate without difficulty, and was able to sit on a bed and visit with other patients.  Plaintiff was discharged on March 6, 2012.  Plaintiff was asked to follow up with his primary care physician on March 23, 2012.

On March 8, 2012, Ms. Robin D. Cowan, RN, BSN, called Plaintiff to check on his well-being following his hospital stay.  (Doc. 11, pp. 735-737).  Plaintiff reported that he was doing better than he was prior to admission, and that he was taking all medications as prescribed.  Plaintiff voiced no questions or concerns.

On March 20, 2012, Plaintiff called and spoke to Ms. Elizabeth S. Mick, RN.  (Doc. 11, pp. 732-733).  Plaintiff wanted to discuss the results from the cardiology consult that he underwent in September of 2011.  The medical records for this September consult report the following:

> He has mild aortic stenosis and enlargement of the ascending aorta which does not reach surgical significance.  I would place him on low dose beta blocker,

then Holter.  He should have a yearly echo, and his aorta should be followed with serial CT scans.

(Doc. 11, p. 734).  Nurse Mick told Plaintiff that he was scheduled for an appointment on March 23rd, and that his doctor would review the records at that time.  Plaintiff denied chest pain, shortness of breath or dizziness.

On March 23, 2012, Plaintiff underwent chest x-rays.  (Doc. 11, p. 677).  No acute cardiopulmonary process was identified.  Plaintiff also underwent retinal image testing, and a Holter Monitor test in April of 2012.  (Doc. 11, pp. 701, 722, 888, 898-899, 909-920).

On May 18, 2012, Plaintiff underwent a pulmonary function test.  (Doc. 11, pp. 104). The test results indicated a possible thoracic obstruction, and a clinical correlation was recommended to exclude extra-thoracic obstruction.

On May 22, 2012, Plaintiff underwent a cardiac consultation for his aortic stenosis. (Doc. 11, pp. 1044-1047).  Plaintiff reported little exercise due to his arthritis with instability of his left knee and lower back.  With the exception of pain with coughing, Plaintiff denied any difficulty with chest pain.  Plaintiff reported occasional lightheadedness when standing. Plaintiff's girlfriend reported Plaintiff snored and sometimes stopped breathing at night. Plaintiff was diagnosed with a bicuspid aortic valve with moderate stenosis and mild aortic regurgitation; ascending aortic ectasia; hyperlipidemia; chronic low back pain; and degenerative joint disease of the knees.  Dr. James As Haisten recommended that Plaintiff maintain a low cholesterol diet; refrain from heavy manual labor or lifting; start simvastatin; and return for further bloodwork in one and three months.  Plaintiff was also to undergo an echocardiogram in one year.

On June 12, 2012, Dr. Jerry Thomas, a non-examining medical consultant, completed a RFC assessment stating that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that postural, manipulative, visual, communicative or environmental limitations were not evident. (Doc. 11, pp. 945-952).  After reviewing all of the evidence of record, Dr. Sharon Keith affirmed Dr. Thomas's assessment on January 23, 2013.  (Doc. 11, pp. 1160-1165).

On June 13, 2012, Plaintiff presented to the emergency room with complaints of a three day history of dull left anterior chest pain.   (Doc. 11, pp. 1025-1029, 1061-1071).   Plaintiff denied any increase in pain with exertion, but noted that he did not do much due to his arthritis. Plaintiff underwent chest x-rays that revealed no significant changes from previous exams. Plaintiff was diagnosed with atypical chest pain.

A telephone encounter note dated June 15, 2012, reveals Plaintiff's report that his pain was not as intense. (Doc. 11, pp. 1059-1060). Plaintiff denied pain associated with nausea or diaphoresis, denied shortness of breath, denied exercise induced pain, and denied radiation of pain.  Plaintiff reported that he wanted to undergo the recommended sleep study, but indicated he did not have transportation.

On August 21, 2012, Plaintiff underwent a CT scan of the thorax that revealed no significant change. A non-calcified nodule remained unchanged.  (Doc. 11, pp. 1024-1025, 1057).

A cardiology note dated August 23, 2012, reveals that Plaintiff reported being reasonably physically active up until February of 2012, but in the last six months he reported being less active.  (Doc. 11, pp. 1051-1057).  Plaintiff complained of lightheadedness with activity and standing.  Plaintiff reported experiencing a dull and sharp midsternal chest pain in the past two months that would last from minutes to an entire day.  Plaintiff was referred to the Little Rock Veteran's Hospital for a heart catheterization.

On September 11, 2012, Plaintiff was admitted into the hospital and underwent a heart catheterization.  (Doc. 11, pp. 956-969, 976-1024).  Upon admission, Plaintiff reported a worsening of his dizziness, weakness, and fatigue over the past six months.  Plaintiff also reported having limited functional capacity due to pain in his feet and knees.  Plaintiff reported he was able to help his girlfriend with her grandchildren, and that he could do light duties around the house without a worsening of symptoms.  A musculoskeletal assessment performed when Plaintiff was admitted revealed Plaintiff had a full range of motion without pain.  The record reveals no complications as a result of the catheterization.  The test results indicated normal coronary arteries and moderate aortic stenosis.  Dr. James D. Marsh strongly doubted that Plaintiff's symptoms were related to his valve.  Dr. Marsh opined that Plaintiff would develop severe aortic stenosis in five to ten years, and that there was no therapy proven to slow down the progression of aortic stenosis.  Dr. Marsh recommended that Plaintiff consider work that did not require lifting over twenty pounds.

Treatment notes dated September 19, 2012, indicate Plaintiff called the clinic to ask what jobs he could perform.  (Doc. 11, p. 1048).  Plaintiff also reported that his left hand from the little finger up to the forearm felt funny.  Dr. Judit opined that Plaintiff had an ulnar nerve

entrapment of the elbow.  Plaintiff was instructed to keep the elbow straight and to avoid leaning on it.

On September 20, 2012, Plaintiff underwent an echocardiogram and Doppler study. (Doc. 11, pp. 1075-1080, 1108-1113).  The study showed the following:

> normal left ventricular size and systolic function, upper limits of normal wall thicknesses, mild mitral regurgitation, probably bicuspid aortic valve with moderate stenosis and mild to moderate insufficiency, mildly elevated right-sided pressures.  The ascending aorta is poorly visualized but probably mildly dilated at the arch at about 42 mm.

(Doc. 11, p. 1112).

On October 5, 2012, and October 9, 2012, Plaintiff called the clinic to report pain from his arthritis.  (Doc. 11, pp. 1105-1107).  Nurse Kathleen Y. Westbrook spoke to Plaintiff on October 11, 2012.  Plaintiff reported that the medication had not helped with the pain for the past two months, and he rated his pain a seven to eight out of ten all over but especially in his low back and knees.  Plaintiff reported that he had used his girlfriend's hydrocodone which had helped relieve the pain for about an hour.  Nurse Westbrook noted Plaintiff needed a primary care appointment to discuss pain control.

On October 26, 2012, Dr. Melissa F. Jackson, a non-examining medical consultant, opined that Plaintiff did not have a medically determinable mental impairment.  (Doc. 11, pp. 1081-1094).

A cardiology note in November of 2012, indicates that Plaintiff had not had any chest pain or syncope. (Doc. 11, pp. 1100-1104).  Plaintiff reported experiencing difficulty with arthritis, and some difficulty with shortness of breath.  An EKG revealed normal sinus rhythm at 68 beats per minute.  Plaintiff was diagnosed with moderate aortic stenosis; ascending aortic

ectasia; moderate pulmonary hypertension; hyperlipidemia; chronic lower back pain; and degenerative joint disease of the knees.  Dr. Haisten recommended that Plaintiff undergo an echocardiogram in twelve months, followed by bloodwork and an EKG; and that the pulmonary group needed to review Plaintiff's studies to determine treatment for Plaintiff's pulmonary hypertension.

On November 19, 2012, Plaintiff underwent a pulmonary consultation.  (Doc. 11, pp. 1118-1125).  A review of systems reveals Plaintiff denied headaches, exertional chest pain, arthritis or abdominal pain.  Dr. Kimberly R. Agee noted that no medication changes were made at this visit.

On December 3, 2012, Plaintiff underwent a Doppler study of the lower extremities that revealed no evidence of lower extremity deep vein thrombosis on either side.  (Doc. 11, pp. 1135-1136).

Treatment notes dates December 10, 2012, indicate that Plaintiff's pulmonary function test results revealed normal spirometry, lung volumes, and gas transfer.  (Doc. 11, p. 1153).

On December 12, 2012, Plaintiff underwent a lung scan to rule out chronic thromboembolic pulmonary hypertension.  (Doc. 11, pp. 1131-1134).  The scan revealed normal ventilation and perfusion.  On the same date, Plaintiff was referred to physical therapy to help address his neck and shoulder tension.  (Doc. 11, pp. 1150-1152).

On December 27, 2012, Plaintiff was seen by his primary care doctor.  (Doc. 11, pp. 1142-1148). Plaintiff reported that his shortness of breath was unchanged, and he denied a productive cough.  Plaintiff complained of having pain "all over" but declined medication adjustments or other pain management interventions.  A Pulmonary Note indicates that

8

Plaintiff had no new complaints.  Treatment notes show Plaintiff was prescribed sildenafil, and that he would need to have his blood pressure checked every three to five days to make sure his blood pressure was not too low.

On January 16, 2013, Plaintiff was seen by Dr. Ronald Kantola of the Arkansas Heart Center.  (Doc. 11, pp. 1154-1159).  Dr. Kantola noted Plaintiff had a normal angiogram in September of 2012; that Plaintiff reported he could walk two blocks; and that Plaintiff had been diagnosed with pulmonary arterial hypertension.  Plaintiff was examined and assessed with aortic valve disease, pulmonary hypertension, and essential hypertension.  Dr. Kantola opined that Plaintiff would likely require an aortic valve replacement in the next five years.  Dr. Kantola further opined that Plaintiff would continue to have limitations from his valve, and would likely have limitations after surgery from his pulmonary hypertension.

On April 15, 2013, Plaintiff called the nurse hotline due to concerns regarding swelling in his feet and toes. (Doc. 11, pp. 1176-1189, 1211-1278).  On April 16, 2013, Plaintiff presented to the emergency room with complaints of chest pain.  Plaintiff denied shortness of breath, but reported more frequent chest pain lasting from seconds to two to three minutes.  Plaintiff was admitted to telemetry where a myocardial infarction was ruled out by serial Troponins.  Chest x-rays revealed a stable chest without significant change from previous exams.  After reproducing chest pain during a treadmill stress test, it was recommended that Plaintiff be transferred to Little Rock for a cardiac angiography to evaluate Plaintiff's aortic stenosis.  Plaintiff was discharged from the Little Rock hospital on April 22, 2013, with what was determined to be non-cardiac chest pain.  (Doc. 11, p. 1190).

A Pulmonary note dated April 29, 2013, indicates that Plaintiff had pulmonary hypertension, likely related to valvular heart disease, but was doing well on sildenafil.  (Doc. 11, pp. 1190-1194).  On the same date, Plaintiff reported continued shortness of breath with exertion.  Plaintiff also reported that his pain was about a four on a scale of one to ten.  Plaintiff was instructed to return for a follow up appointment in eight months.

On June 25, 2013, Plaintiff complained of depression and a lack of motivation.  (Doc. 11, pp. 1317-1326).  Plaintiff reported that he was living on his unemployment, and that he spent his time sitting and reading.  Plaintiff reported he was working on getting disability due to his arthritis. Plaintiff was noted to have presented to the mental health clinic due to situational stressors. Plaintiff reported once unemployment ran out, he would find a job.  Upon evaluation, Plaintiff was noted to have mild depression.  Plaintiff's recent and remote memory were noted as "good."  Plaintiff was diagnosed with a mixed adjustment disorder.

On July 31, 2013, Plaintiff complained of edema in his feet and bilateral numbness and tingling in his hands, worse at night.  (Doc. 11, pp. 1280, 1306-1310, 1313).  Plaintiff denied headaches, neck pain or stiffness, shortness of breath, or chest pain.  Plaintiff reported no change in muscle pain, and intermittent joint pain in multiple areas.  Upon examination, Plaintiff exhibited normal flexion, extension, lateral rotation and tilting of the neck; had no spinal tenderness; had no edema of the extremities; had 5/5 strength in all extremities; and exhibited normal range of motion without deformities. Cervical x-rays revealed slight degenerative disease, minimal malalignments, no apparent significant foraminal narrowing, mild scoliosis, and old minimal wedging of C5.  Plaintiff was diagnosed with an adjustment disorder with mixed anxiety and depressed mood; an aortic aneurysm; stable pulmonary

hypertension; stable aortic valve stenosis; hyperlipidemia; backache; arthralgia; abdominal pain; and dental caries.  Plaintiff was also noted as being overweight.

On August 8, 2013, Plaintiff underwent a CT of the thorax.  (Doc. 11, pp. 1278, 1311-1312). Dr. Mary Jo Henry's impression states as follows:

> 1. Bilateral subcentimeter pulmonary nodules are stable.  Stability should be documented for a minimum of two years.  For this reason, repeat CT chest in one year recommended.  2. Mild dilatation ascending thoracic aorta measuring 4.3 cm in AP dimension. 3. Mild mesenteric stranding and mildly prominent lymph nodes upper abdomen are stable.

Id. at 1279.

On September 9, 2013, Plaintiff was seen by psychiatrist, Richard C. Heckmann, MD. (Doc. 11, pp. 1289-1306, 1313-1314).  Dr. Heckmann noted that Plaintiff was first seen in the mental health department in March of 2013, and that Plaintiff reported that he was mentally exhausted.  Plaintiff reported that his job ended in February of 2012, when the business he worked for closed.  Plaintiff indicated that he spent his time looking for work, playing video games, reading a lot of books, and watching television.  Plaintiff reported that he received unemployment, and also lived with his disabled girlfriend who brought in disability income. Plaintiff was noted to have many recent mental health telephone calls to a nurse, and was started on sertraline, but stopped taking it due to feeling chest flutters.  Plaintiff's muscle strength and tone, as well as his gait and station, were noted as normal.  Dr. Heckmann opined that Plaintiff was much more intelligent than the average general semi-skilled laborer.  Plaintiff was started on a trial of bupropion, given a reading assignment, encouraged to exercise thirty minutes a day, and to make a follow up appointment to return in two months.

On October 15, 2013, Plaintiff underwent an echocardiogram.  (Doc. 11, pp. 1330-1331).  The study revealed a tricuspid velocity minimally elevated with mild elevation of right-sided pressures.  On the same date, Plaintiff was noted to have good ocular health. (Doc. 11, pp. 1332-1333).

On October 30, 2013, Plaintiff underwent a sleep study due to suspected obstructive sleep apnea.  (Doc. 11, pp. 1329-1330, 1375, 1392-1395). The study was abnormal and confirmed the clinical impression of obstructive sleep apnea.  Due to the modest nature of Plaintiff's respiratory events, the recommended treatment consisted of the use of nasal strips or a snore ball.

On November 5, 2013, Plaintiff was seen by Dr. Heckmann.  (Doc. 11, pp. 1377-1383). Dr. Heckmann noted Plaintiff was disheveled and coughing quite a bit.  Plaintiff declined shaking hands due to his cold.  Muscle tone was not tested because Plaintiff did not want to be touched, as he thought he might be contagious.  Dr. Heckmann noted that Plaintiff did not disclose to him at the previous session that he was being tested for sleep apnea which could explain some of Plaintiff's symptoms.  It was recommended that Plaintiff continue his medication, that he exercise thirty minutes a day, and that he read the reading assignment assigned at the previous appointment.

A cardiology note dated December 2, 2013, reveals Plaintiff was in for his twelve month follow-up appointment. (Doc. 11, pp. 1368-1374).  Plaintiff reported that since his last visit, he had a funny, light feeling in his chest but denied pain.  Plaintiff reported chronic mild shortness of breath.  Dr. Haisten recommended Plaintiff undergo a Holter Monitor study, a

follow-up echocardiogram, and blood work.  Plaintiff was to schedule a follow up appointment in four months.

A Pulmonary Note dated December 19, 2013, indicates Plaintiff's pulmonary hypertension was doing well with sildenafil, and that Plaintiff's aortic stenosis was noted as moderate.  (Doc. 11, pp. 1362-1367).  Plaintiff denied any change in shortness of breath, but reported an occasional dry cough.  Examination notes revealed that Plaintiff had no extremity edema.  On this date, Plaintiff also underwent a Holter Monitor study.  (1388-1391, 1406-1427).

On December 20, 2013, Plaintiff was seen by Dr. Heckmann for a follow-up appointment.  (Doc. 11, pp. 1353-1361).  Plaintiff reported if he received "disability money" he would not be depressed.  Plaintiff reported he tried to read the suggested book but was unable to read it.  Dr. Heckmann noted that Plaintiff was groomed more neatly than the previous visit.  Plaintiff also walked with a limp, and moved in his chair during the session and indicated this was due to his arthritis.  Plaintiff was noted to experience a significant mood response to the bupropion dose increase.  Dr. Heckmann noted that it was distressing that Plaintiff had not done the recommended reading.  Dr. Heckmann indicated that Veterans Upward Bound might be a great option for Plaintiff, but that Plaintiff would have to stop criticizing every suggestion made.

Plaintiff was seen by his primary care physician for an annual evaluation on January 13, 2014.  (Doc. 11, pp. 1337-1342, 1347-1351, 1441, 1449).  Plaintiff complained of chronic neck pain and orthostatic hypotension.  Plaintiff reported the Trazadone dosage to help him sleep was not enough, and that he had an appointment with Dr. Heckmann in a month.  Plaintiff

reported his bilateral hand and wrist and neck pain were getting worse.  Plaintiff also reported that when he wore shoes his feet hurt.  Upon examination, Plaintiff had no spinal tenderness, no edema in the extremities, normal range of motion without deformities, and good strength in all extremities.  X-rays of the left and right foot revealed a small calcaneal spur in each foot.

On February 7, 2014, Plaintiff underwent a CT scan of the chest, abdomen and pelvis. (Doc. 11, pp. 1443, 1445-1447, 1450).  The impression was as follows:

> 1. Several small, subcentimeter, noncalcified bilateral pulmonary nodules are either stable or decreased in size when compared to previous exams and are likely of a benign etiology.  Two year stability should be documented.  For this reason, repeat CT chest in one year recommended.
>
> 2. Ascending thoracic aorta measure 4.0 cm in AP dimension and is mildly dilated.  No evidence of abdominal aortic aneurysm.
>
> 3. Mildly stranding upper mesenteric fat with mildly prominent mesenteric lymph nodes, unchanged.

Id. at 1446.

On February 10, 2014, Plaintiff underwent an evaluation for physical therapy.  (Doc. 11, pp. 1454).  Treatment notes indicate Plaintiff was referred for cervical traction.  Plaintiff reported that when he looked down, both hands and fingers tingled.  Plaintiff reported his pain was mostly localized in his neck, and he denied a loss of function.  Transportation to therapy was noted as being an issue for Plaintiff due to the lack of finances.

Physical therapy notes dated February 14, 2014, reveal Plaintiff felt better after his initial traction session.  (Doc. 11, pp. 1455-1456).  Plaintiff indicated that his neck felt better until about 5:00 following his initial traction session.  Plaintiff thought the tingling was beginning to decrease as well.  During this visit, Plaintiff had another traction treatment.

14

Medical records dated after the ALJ's February 14, 2014 hearing decision, reveal that that Plaintiff received follow-up treatment for his heart problems and hypertension, his foot and neck pain, and other complaints after the relevant time period.

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c (a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. §§

423(d)(3), 1382(3)(C).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. § 404.1520.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. § 404.1520.

## IV.    Discussion:

Plaintiff argues the following issues on appeal: 1) the ALJ failed to fully consider the evidence of record when he found Plaintiff could perform a full range of light work and ignored the effects of Plaintiff's osteoarthritis and longstanding history of aortic stenosis on his ability to perform light work; and 2) the ALJ did not properly form his hypothetical question posed to the vocational expert.

### A.    Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5)

functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.  A review of the record reveals that Plaintiff was able to take care of his personal needs; to prepare simple meals; to do light household chores; to drive; to shop for groceries; and to read, watch television and play video games throughout the relevant time period.  (Doc. 11, pp. 274-281).  In September of 2012, Plaintiff reported that he was able to help his girlfriend with her grandchildren, and to perform light duties around the house without experiencing a worsening of his symptoms. (Doc. 11, pp. 1000-1001).  In September of 2013, Plaintiff reported that he spent his time looking for work, playing video games, reading a lot of books, and watching television.  This level of activity belies Plaintiff's complaints of pain and limitation and the Eighth Circuit has consistently held that the ability to perform such activities contradicts a Plaintiff's subjective allegations of disabling pain. See Hutton v. Apfel, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimant's application supported by substantial evidence where daily activities– making breakfast, washing dishes and clothes, visiting friends, watching television and driving-were inconsistent with claim of total disability); See Cruze v. Chater, 85 F.3d 1320, 1324 (8th Cir.1996) (mowed lawn, shopped, odds jobs and visits town.

The record further reveals that Plaintiff received unemployment benefits during the relevant time period.  While the receipt of these benefits is not conclusive, applying for unemployment benefits adversely affects credibility because an unemployment applicant "must hold himself out as available, willing and able to work.  Smith v. Colvin, 756 F.3d 621, 625 (8th Cir. 2014).

With respect to Plaintiff's alleged neck, back and knee pain, the record reveals this pain was treated conservatively.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998) (conservative treatment is consistent with discrediting a claimant's allegation of disabling pain).  The records further reveal that Plaintiff was noted to have full range of motion in his extremities in September of 2012, July of 2013, and January of 2014.  (Doc. 11, pp. 1001, 1309, 1340-41). After reviewing the record, the Court finds substantial evidence to support the ALJ's determination that Plaintiff's neck, back and knee impairments were not disabling during the relevant time period.

With respect to Plaintiff's heart condition, the record shows Plaintiff may require surgery at some point in the future; however, the medical records during the relevant time period reveal Plaintiff's heart condition was stable, and his hypertension was amenable to treatment.  The only limitation placed upon Plaintiff by his treating physicians was not to lift over twenty pounds. As will be discussed below, the ALJ limited Plaintiff from lifting more than twenty pounds in the RFC.  After reviewing the record, the Court finds substantial evidence to support the ALJ's determination that Plaintiff's heart impairment was not disabling during the relevant time period.

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he was unable to engage in any gainful activity during the time period

in question.  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

    **B.**    **ALJ's RFC Determination and Medical Opinions:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In finding Plaintiff able to perform light work, the ALJ considered Plaintiff's subjective complaints, the medical records of his treating and examining physicians, and the evaluations of the non-examining medical examiners. Plaintiff's capacity to perform this level of work is supported by the fact that Plaintiff's examining physicians placed no restrictions on his activities that would preclude performing the RFC determined during the relevant time period. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability). After reviewing the entire transcript, the Court

finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

### C.      Use of the Medical Vocational Guidelines (Grids):

Once Plaintiff has established a *prima facie* case by showing an inability to perform past relevant work, the burden of proof shifts to the Commissioner to show that Plaintiff has the residual functional capacity to perform some other kind of work and that jobs are available in the national economy which realistically fit his capabilities.  Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993).  If the claimant is found to have only exertional impairments (affecting the ability to perform physical labor), the Commissioner may meet this burden by referring to the Grids which are fact-based generalizations about the availability of jobs for people of varying ages, educational background, and previous work experience, with differing degrees of exertional impairment.  Foreman v. Callahan, 122 F.3d 24, 26 (8th Cir. 1997); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992)(citations omitted).  Given the Court's finding that substantial evidence supports the ALJ's determination that Plaintiff is capable of the full range of light work, the Court believes the ALJ properly relied on the Grids, eliminating the need for expert vocational testimony, in concluding that given Plaintiff's age, education, work experience, and capacity for light work, Plaintiff was not disabled.

## V.      Conclusion:

Based on the foregoing, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 6th day of October, 2016.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE